## [No. 3600.]

### Andrew Jackson *v.* The State.

1. CHARGE OF THE COURT.— The law of manslaughter should not be charged on a trial for murder in the absence of evidence tending to establish that degree of culpable homicide.
2. NEW TRIAL.— NEWLY DISCOVERED EVIDENCE will not authorize a new trial if the purpose of such evidence be merely to discredit witnesses who testified on the trial.
3. SAME.— NEW TRIAL will not, however, be defeated by the impeaching character of the newly discovered evidence, if it be otherwise competent and material to the defense.
4. SAME— CASE STATED.— Affidavits in support of a motion for new trial allege that one Mary P., a material witness for the defense, who was a female child of but ten years of age, and who testified at the examining trial, was not present when this case was called for trial; that she was then arrested under attachment and brought into court before the conclusion of the testimony for the defense, and that, being interrogated by the counsel for the defense, she was found to be too much terrified to give an intelligent account of the homicide, wherefore she was not placed upon the stand, but, after the trial and conviction of the defendant, when she had regained her composure, she was again examined by counsel and gave a clear and succinct account of the circumstances attending the homicide.    *Held*, that, in order to have been available as ground for new trial, the defense should have complied with the rule which requires that when a material witness is disqualified to testify by reason of panic or intoxication, the party whose interest is to be subserved by the testimony should notify the court so that an examination into the condition of the witness may be had, and the case postponed or continued, as the justice of the case might require.
5. PRACTICE— PRIVILEGE OF COUNSEL.— Objections to the line of argument pursued by counsel in the discussion of a case must be reserved by exception at the time, and not made for the first time on the motion for new trial.

APPEAL from the District Court of Brazos.    Tried below before the Hon. W. E. Collard.

The death penalty was assessed against this appellant upon his conviction in the first degree for the murder of Jerry Russell, in the county of Brazos, on the 7th day of June, 1884.

Gabriel Turner was the first witness for the State. He testified that the church of which he was a member and the defendant a preacher had a choir meeting on Thursday night before the day of the homicide. Among others the witness, the defendant and the deceased were present. During the exercises the defendant requested the witness to submit to the vote of the people present the question whether or not he should preach. Witness put the question as desired, and but nine votes were cast in favor of the proposition. The defendant, when the result of the vote was announced, declared that he was Christian, and that he was at a loss to imagine what people had against him that they should announce their unwillingness to hear him preach. He then asked that any one present who had voted against him should explain the reason of objection. Thereupon the deceased remarked that, as for him, it did not matter who preached, but that he would not attend services directed by a "man who had never been licensed or ordained to preach,— that he would not go to hear any 'jack-leg' preacher." Defendant instantly became excited, and said that he thanked God some were for him; that he was more fortunate than Christ, who had no one for him. All of the people in attendance upon the choir meeting, except defendant, Elder Thurman, witness and his wife, had left the church, and gone into the church yard. Witness and Elder Thurman endeavored with some success to pacify and quiet the defendant, but he soon became excited again and began to declaim in the same manner, when Thurman told him it was time to stop, that his unpopularity with the people was attributable to just such conduct. Defendant then quieted down and with witness and Thurman went out of the church. Outside he began his tirade again, talking loud, and protesting that he was not a "jack-leg" preacher. He soon joined a crowd composed of the deceased and others, and he and the deceased got into hot words about the occurrence inside the church. Defendant stripped off his coat and wanted to fight the deceased, but persons present interfered, and soon the crowd dispersed and the several parties went home. The deceased was not a member of the church, but it was the recollection of the witness that he called the choir together that night. It was not a regular church night.

William Duty, senior, was the next witness for the State. He testified that he and the defendant, as separate tenants, cultivated Joe Neeley's field. The defendant cultivated the front part of that field, and the witness had a ten-acre patch of cotton in the rear of the defendant's part. The gate by which the field was entered was at the defendant's house. It opened from the outside into a litle lot,

leading thence through another gate into the field, to a turn-row which led from the lot to the defendant's field. This was the only opening to the fields and was the usual entrance to them, but the witness, whose place of residence was behind the field, frequently entered his field by climbing the fence at the back side. The usual means of entering the field from the front (in which direction was the house of Mrs. Turner, where the deceased lived) was at the front gate mentioned. The road running between the two gates in the lot passed very near the defendant's yard fence, just inside of which was the well. The defendant's house stood twenty or thirty steps distant from the well.

Witness arranged with the deceased for the latter to aid him in cutting his cotton, on the day of the homicide. Witness and his son William, junior, and his daughter Mary Jane, reached the field about 7 o'clock on that morning, and had just begun work when the deceased arrived, coming to the field by way of the road which led by the defendant's house. He did not appear in the least excited, and set to work immediately chopping cotton, with the two children, while the witness employed himself barring the cotton off with a plow. Witness was anxious to get through the work on that day, but did not then know whether or not the deceased intended to help all day. Some time during the morning the defendant, who had been plowing in his field near the witness, came to him and asked the loan of a sweep. Witness told him that it was at home. Defendant went to witness's house, got the sweep, and returned. He then remarked: " I see you have got a lively crowd of workers with you." Witness merely replied: " Yes," and defendant then said: " I see you have the Professor (meaning deceased) helping you; how long is he going to help you?" Witness replied that he did not know whether deceased would help all day or not. About 11 o'clock the witness's party knocked off work. The witness having some milling to do started off home by the way of the back fence — William, junior, Mary Jane and deceased started off by way of the road, which, as before stated, ran by the defendant's house. The deceased started to go home to the widow Turner's; Mary Jane was going with a bucket to the well to take water home, and William, junior, horseback, was to go on an errand for witness to Noah Dansby's.

Within a few minutes after the parties named had started on their several routes, the witness heard the report of a gun in the direction of the defendant's house, and soon his son, who was on horseback, joined witness in the field and told him that defendant had shot the

deceased. Witness went immediately to the house. When he arrived the defendant was standing in his yard near the well, with his gun in his hand. Witness told him to put up his gun. He replied that the deceased cursed him, and that he had the right to kill the deceased; and that he had done no more than he would do over again. About this time Jerry Jones, who had been at work in a field near by, arrived, and defendant told him that he would find another dead nigger over there, and that he had better go and dig a hole for him. The body of the deceased was lying in the road in the lot, not far from the well. It lay on the back, life perfectly extinct, with the hat in the right hand. Witness's son William went on to Mr. Noah Dansby's. Mary Pearce, a young half-sister to the defendant's wife, was at the defendant's house when the witness arrived. Witness's daughter, Mary Jane, had gone on home. Defendant's wife was not then at home, but Mary Pearce went to Fannie Turner's, about a half mile distant, after her. Witness arrived on the scene of the homicide before Jerry Jones did, and Jerry arrived before the defendant's wife Jennie did. Witness did not move or touch the body, but, after remaining with it a short time, he went to town and returned with the parties who held the inquest, and was present at the inquest. He saw a derringer pistol taken from the pocket of the deceased. The distance from the defendant's house to the place where the several parties named were at work in the field, on that morning, was some three hundred yards. Defendant's wife worked with him awhile in the field on that morning, but quit before he did. They were at work in the defendant's field, when the deceased arrived at witness's field on that morning. Witness and the defendant had a misunderstanding during the early part of the year 1884, but had become reconciled. Witness testified upon the examining trial of the defendant. Witness made the affidavit upon which the defendant was arrested for this offense. Deceased was not hired to help witness on the day of the homicide, but helped him as a friendly act.

William Duty, junior, was the next witness examined for the State. He testified that he went to his father's ten-acre cotton patch, in the same field cultivated by the defendant, on horseback, early on the morning of June 7, 1884, the day of the homicide. On his road he saw the deceased on his way to the same patch. Deceased was traveling the usual route to that patch, from Mrs. Turner's, where he lived, and passed through both gates described by the preceding witness and the lot, and then over the turn-row to the place where witness, his father and sister were at work. De-

fendant and his wife were then at work in their field.  Witness did not watch the deceased throughout his progress from the first gate to the cotton patch, but saw him pass through both of the gates. The deceased was expected on that morning to help witness, his father and sister chop cotton.  Together with witness and his sister cutting cotton, and his father plowing, the deceased worked about three hundred yards distant from the defendant's house.  The party in the patch knocked off work about 11 o'clock.  Witness's father started home across the back of the field, deceased started to his home at Mrs. Turner's, witness started to go to Mr. Noah Dansby's, and his sister started to go home by way of the defendant's well, where she was to get a bucket of water.  When witness, his sister and the deceased got within about one hundred yards of the first gate from the field, the defendant looked up from his work, saw the party, abandoned his work, and walked rapidly to his house, arriving there before the witness, deceased and Mary Jane.  These last named parties passed through the first gate, the deceased holding it open so that the witness, who was horseback, could pass through. Mary Jane got over the fence to the well.  Defendant was then standing near the well, but witness did not at that time see his gun. Deceased and witness then started along the road which lay alongside the defendant's yard-fence, towards the gate which opened into the lot.  Just as the deceased got opposite the well, at which the defendant stood, the defendant called to him:  "What did you mean by talking to me as you did the other night?"  Deceased replied:  "I will see you some other time about that."  As the deceased then turned to walk off in the direction of his home, defendant said:  "You won't see any better time than right now;" and at the same time he raised his gun and fired, the charge taking effect in the body of the deceased in the back or left side, near the shoulder-blade.  Deceased fell, back down, and expired without speaking a word.

The deceased used no harsh words towards the defendant just prior to the shooting, nor did he make any hostile demonstrations towards him, but had started off with his hat in his hand.  The defendant got the gun he used from behind the curb of the well.  The witness's sister, Mary Jane, was in the defendant's yard, near the well, when the shot was fired, and the witness was on his horse near the deceased.  Witness did not dismount and open the lot gate, nor was he near the lot gate when the fatal shot was fired.  As soon as the shooting occurred, he went to the field, told his father, then returned and went direct to Noah Dansby's, thence home to dinner, thence

to the house of the defendant, where the inquest over the body was held that evening. He was present and testified before the inquest. Defendant's wife, Jennie, was not at home when the shooting occurred, but was present at the inquest, which was the first time witness saw her on that day after the parties left the field. Mary Pearce, the half-sister of the said Jennie, was at the house when the shooting occurred. Witness knew that, at a church gathering a few nights before, some few hard words were exchanged between the deceased and the defendant, but did not know, when he went into the lot, that any particular hard feeling existed between them. At the church meeting referred to, deceased called the defendant a "jack-leg" preacher, and the latter took off his coat to fight, but a collision was prevented by parties present. If the deceased had a conversation with any one at the house of the defendant on the morning of the killing, the witness did not know it. The nearest part of the cotton patch of the witness's father was about one hundred yards distant from the defendant's house, but it was about three hundred yards from that house to the point where the parties were engaged in chopping cotton on that morning. The witness saw a pistol taken from the pocket of the deceased at the inquest. Deceased did not draw that or any other pistol, nor make a motion to do so, before or at the time of the shooting. He was turning away when he was shot. Mary Jane went on home immediately after the shooting. Jerry Jones was not at the place of the shooting while the witness was there.

The testimony of Mary Jane Duty was substantially the same as that of her brother, William Duty, junior. She repeated the words that passed between the deceased and the defendant just prior to the shooting just as they were stated by her brother William, except that those of the defendant were prefaced with the greeting: "Good morning, Professor; how do you do this morning?" To which the deceased replied: "Good morning, sir." The deceased did not curse the defendant on that morning, nor did he draw a pistol. He made no demonstration as if to draw one, nor did he have his hand about his pocket. Witness had passed into the yard, to the well near the fence. Defendant was standing near the well, and but a very short distance from deceased, when he fired. Witness and deceased were not sweethearts, nor were they engaged to be married when the killing occurred. The only discrepancy between the narrative of this witness and that of her brother was her statement, on cross-examination, that she and deceased first passed through and closed the gate, and that her brother dismounted at the

gate, opened it, went into the lot, closed it, and was in the act of getting back on his horse when the fatal shot was fired. Jerry Jones was nowhere in sight when witness left.

Alice Duty testified, for the State, that she went from home to the defendant's house shortly after her daughter Mary Jane got home from the cotton patch and told her of the shooting. She found the deceased lying on his back, dead, and watched the body until the arrival of the inquest party and Doctor Cavitt. The body was not touched or moved by witness or any one else from the time that she arrived until after the arrival of the inquest party.

Cross-examined, the witness testified: "We had had a fuss with the defendant, and did not like him. Jerry Russell was friendly with us; was frequently at our house, and sometimes escorted our daughter, Mary Jane, to Sunday school."

Doctor Cavitt, the next witness for the State, testified as follows: "In June, 1884, I was a practicing physician in Brazos county, and on the day of the homicide I went out to the inquest. I found the body of the deceased lying in the lot, near the defendant's house. It was lying in the road near the fence, and the fence was near the well. The body was lying on the back, the right hand was clutching the deceased's hat, and the left hand was thrown back from the body and half bent up at the elbow. One foot was crossed on the other, and it appeared that he fell as he turned and started to walk. I found a derringer pistol in his left pants pocket. It was loaded but was not cocked, and was at the bottom of the pocket. From the position of the deceased's left hand, I should say that he was not trying to get his pistol from his pocket when he was shot. If his hand had been about his pocket, it would not have fallen into the position in which I found it. I found a large wound in the deceased's back. It went in under the left shoulder-blade and came out at the left breast, and I think tore the heart out in its passage. It made a large hole entirely through the body. I stood over the body and dropped a stick through the wound, and it struck the ground on the other side. I saw no indications that the deceased's body had been moved or disturbed before I came." The State closed.

The State consenting, the defense read in evidence the written testimony of Jerry Jones, as taken upon the examining trial. It was as follows:

"I was at work next to Andrew Jackson's house on last Saturday. I knew Jerry Russell, and saw him on the Saturday before last Saturday. He is now dead. I did not know of any hard feelings between the deceased and Andrew Jackson until last Saturday

morning. I saw Jerry Russell early in the morning before he was killed. I saw him at Andrew's gate. I was working in Montgomery's field. Jerry Russell did not come into the field. The Saturday morning Jerry Russell was killed, he had some words to say about Andrew Jackson. He said that he came there to kill or to be killed. He had arms on him;— I know it, because he pulled it out of his pocket and showed it to me. The arms consisted of a derringer pistol. It was loaded. I looked into the barrel. He did not say anything about the cause of the hard feelings, but he talked like he had hard feelings. When I was standing at the gate Andrew was gearing his horse. I went and had a conversation with Andrew. I went and told Andrew that Jerry had sworn to kill him; that Jerry Russell had a pistol, and that he had threatened to kill him, and that he had better prepare himself or get out of the way. Andrew went and loaded his gun. I saw him load it. He loaded it on the gallery, and then set it back in the house. He went on through the bars down into the field. I never saw the Dutys that morning. I was not there when the shooting took place. I was up in the field. I was there after the shooting took place. Jerry Russell was killed over in the lot not far from the well. He was lying on his back. I went and looked at him. I don't know whether he had his pistol on him then or not. I was about fifteen yards from the house, working. I heard Jerry Russell call Andrew Jackson a 'd—d yellow son-of-a-b—h' and a 'd—d white folks' nigger.' I heard Andrew say to go way from there, if he did not he would hurt him. This was on Andrew's own premises. I was not present at the inquest. I am no relation to Andrew Jackson. I have known Andrew Jackson four or five years."

On cross-examination: "I was standing at the yard gate. Russell was there, too. Andrew was at the lot gearing his horse. I came over to light my pipe. He showed me the pistol. It was loaded. He cursed Andrew at the lot. Russell cursed him and called him a 'd—d white nigger son-of-a-b—h.' I went there for water and to light my pipe. Andrew and I are on good terms. Andrew went in the house after his gun, when he pointed his pistol at him and told him: 'I came here to kill or be killed.' I did not see him snap the pistol at him. Andrew was in the lot. He was not close to him. His wife came out. Jerry cursed her. I did not see him point his pistol at Andrew's wife. Jerry did not run (when?) Andrew went into the house after his gun. He went in the house and got his gun. He came on the gallery and then went back in the house with his gun. I went and took Andrew off and

told him what Russell had said about killing him. I did not stand by him but was standing near the gallery when he loaded the gun. He said if Jerry came back he would hurt him. Where I was working was about fifteen yards away. I heard some quarreling before I heard the shooting. I was where I could hear the quarreling. I could see the house, but I did not see them. When the first shot fired I went to see what was the matter. Andrew's wife was coming up the lane. The William Duty who was on his horse had gone into the woods, but he turned and came back. I don't know where Andrew's wife had been. When I got to the house Andrew was walking in the yard. Andrew did not say anything about a dead nigger being over there. Andrew did not get his gun until I told him about Russell threatening him. After Jerry went down in the field he went down and loaded his gun."

Jennie Jackson, the wife of the defendant, was placed upon the stand in his behalf. She testified that she was at home on the morning of the day of the homicide. About 8 o'clock on that morning, while the defendant was in his lot gearing up his horse, the deceased, passing through the lot, stopped and cursed him. He called the defendant a " G—d d—d yellow son-of-a-b—h, and a G—d d—d white man's nigger." He said to the defendant that he had come there that morning to kill or be killed. The defendant told the deceased to go away,— to get out of his lot. The deceased then drew a six-shooter from his pocket and threw it down in the defendant's face. Witness saw the pistol distinctly, but, correcting herself, said that it was a derringer pistol and not a six-shooter. He pointed that pistol directly at the defendant from very close range. The witness was in the house when the quarrel first began, but on hearing it, she went out to the lot and was present as it progressed; and during that time was cursed herself by the deceased. The deceased after a time went on down into the field where the Dutys, father, son and daughter, were. During a part of the time that the quarrel was going on, Jerry Jones stood at the defendant's gate. He came there from his field, where he had been at work, to get a drink of water and to light his pipe. He came direct from his work to the gate, and after this quarrel was over, and the deceased had gone on to Duty's cotton patch, he, Jerry Jones, came up to defendant's house, but did not go to the lot. During the few minutes that Jones stayed at the house, the defendant came back from the lot to the house, but he and Jones had no private talk. Jones went back to his work before defendant went to his work. Witness went to the field for a short time on that morning, but did no work. Witness

was on her way home from Mrs. Turner's, where she had gone to get some meat for dinner, when the shooting occurred. She was within one hundred yards of home, in the lane, when the fatal shot was fired, but before the shot she heard some loud talking. Witness went to the house immediately and saw no one present but defendant, Mary Pearce and Jerry Jones.

Cross-examined, the witness testified that as she approached the house, William Duty, junior, came riding up from the direction of Noah Dansby's. His father was not present. His sister Mary Jane was then half way home with a bucket of water, but turned and came back. Jerry Jones was standing at the lot gate, and not at the yard gate. Witness testified on the examining trial, but did not swear on that trial that "Jerry Jones was standing at the front yard gate both times, early in the morning and at the time of the killing," nor did she use words to such effect. Her testimony on that trial was the same as upon this. She denied that she said, on the examining trial, that she did not see the deceased have arms on that morning, and that he made no demonstrations to assault the defendant as he passed through the lot, nor did she use words of such import in her testimony upon the examining trial. To her present statement concerning her previous testimony the witness adhered notwithstanding the State confronted her with her declarations on the examining trial as contained in her written testimony.

John and George Jenkins testified, for the defense, that they were present at the church quarrel between the defendant and the deceased. Deceased called the defendant a "jack-leg preacher," a "d—d yellow-son-of-a-b—h," and a "white man's nigger," and said: "If you fool with me, I will shoot your d—d head off." Defendant stripped off his coat to fight, but the fight was prevented by the crowd.

J. J. Neeley testified, for the defense, that he owned the field cultivated by the defendant and William Duty in 1884. Defendant had the front of the field and lived in the house; Duty had about ten acres at the back of the field. Widow Turner lived fronting the field, but in going from Mrs. Turner's to Duty's patch, it was not necessary to travel the road and go through the two gates and the lot. From Mrs. Turner's to the Duty patch it was near two miles by the road, and nearer by a half mile to cross Mrs. Needham's field, the witness's pasture and an open woodland. There was no road over this route, but there was very little plowed land. The field cultivated by Jerry Jones reached to the defendant's yard fence. Witness had known the defendant several years. Prior to

this homicide, his reputation for peace and law-abiding qualities was good. Witness was not defending the accused, but helped to select the jury.

In rebuttal, the State first read the written testimony of Jennie Jackson, taken before the examining trial, and showed therefrom that on that trial she testified that "Jerry Jones stood at the front yard gate both times on the day of the killing,— early in the morning and when the killing occurred," and that "she saw no arms about the deceased on that morning, nor did she see him make any demonstrations to assault the defendant as he passed through."

The justice of the peace who presided at the examining trial identified the writing introduced by the State in rebuttal, as the written testimony of Jennie Jackson taken on that trial, and which she signed after the same was read over to her.

The motion for new trial raised the questions discussed in the opinion.

*J. D. Thomas* filed an able brief for the appellant.

*J. H. Burts,* Assistant Attorney-General, for the State.

HURT, JUDGE.   At the March term of the district court of Brazos county Andrew Jackson, the appellant, was tried for the murder of Jerry Russell. He was convicted of murder of the first degree, the death penalty being imposed. From this conviction and judgment thereon he appeals to this court.

Appellant insists that the court below should have instructed the jury upon the subject of manslaughter. There is no evidence in this record presenting or tending to present this degree of homicide.

The third error assigned is that the court should have granted appellant a new trial. Two grounds are relied upon: 1st. Insufficiency of the evidence to sustain a conviction for murder of the first degree. 2d. Newly discovered evidence.

1st ground: If the witnesses for the State are credible,— and we find no reason, *if we had the right,* to doubt their veracity,— the evidence is amply sufficient to support a conviction for murder of the first degree.

2d ground: Newly discovered evidence. The evidence discovered consists of facts which go simply to impeach the witnesses William Duty, Jr., and Mary Jane Duty. These witnesses testified that they were present at the homicide, and that after the shooting they left. The Reeds in their affidavits state that soon after the shooting they went to the place of the killing, and that neither

William nor Mary Jane were there. In this there is no conflict, for they (the Dutys) testify that they were not there when the Reeds arrived. . But, concede that the facts contained in the affidavits of the Reeds are in conflict with the evidence of the Dutys, being simply calculated to impeach these witnesses, a new trial should not be granted.

Upon this subject Messrs. Graham and Waterman say: " Closely allied to the preceding rule is another, that, if the alleged newly discovered evidence consists in an attempt to discredit witnesses who testified at the former trial, a new trial will not be granted." (Vol. 1st, 496.)

We desire to make some observations on this rule. Let us suppose that the newly discovered evidence not only tends to discredit a witness, but that it is also material and competent, independent of its impeaching tendency. The fact that it impeaches a witness will not deprive the party of a new trial; but to justify a new trial it must be something more than impeaching testimony.

Again, it is claimed that a new trial should have been granted because the little girl, Mary Pearce, who was about ten years old, was so alarmed by being under arrest, and by the crowd in the court-house, that she could make no intelligent statement of the facts. This girl had testified before the examining court, and her evidence reduced to writing. When the cause was called for trial she was not present, and defendant had an attachment issued, and she was arrested and brought before the court before defendant closed his evidence. Being interviewed by counsel for defendant, it was discovered that she was so alarmed that she could not give an intelligent statement of what she saw and heard at the homicide. This is the substance of the affidavits of the counsel for defendant.

The girl was not introduced as a witness. After the trial and conviction herein, being examined again by counsel for defendant, she had regained her self-possession and made a clear statement of the facts attending the homicide. Now upon this matter it is insisted that the court should have granted a new trial.

We do not think so, because the defendant did not pursue the rule upon this state of case. The rule is that when a material witness for a party is incapacitated to testify by being panic stricken, or by being intoxicated, a new trial should not be granted unless, when discovered, the party desiring to use the witness informs the court of the condition of the witness, so that the court may have an examination made into the circumstances of the case, and upon finding that the witness, without defendant's fault, was not in a situa-

tion to be examined, the trial might be delayed for a time, or the announcement withdrawn and the case continued until the next term. (Graham & Waterman on New Trials, 976 and 977; *Mann* v. *Clifton*, 3 Blackf., 304; *Iseby* v. *Lovejoy*, 8 Blackf., 462.) There is nothing in *Heskew* v. *The State*, 14 Texas Ct. App., which bears upon this question.

Another ground submitted for reversal of this judgment is that the district attorney went out of the record in his argument, and misled the jury, etc. This matter appears only in the motion for new trial. The record fails to show that defendant objected to the argument of the district attorney, or called upon the court to check him in this course of argument. The rule is that all such matters must be excepted to at the time, and reserved by bill of exceptions.

We have examined all of the supposed errors submitted by counsel for defendant, and must say that, if there be error in this record, we have not found such. The facts are few and unequivocal. A few days before the homicide the deceased (Jerry Russell) and defendant had hot words at church. On the day of the homicide William Duty had employed deceased to help him chop cotton on a ten-acre lot within the field cultivated by Duty and defendant. At about 11 o'clock they ceased working. William Duty, Jr., Mary Jane Duty and deceased went from the cotton patch by the house of defendant on their way home. When they had reached within about one hundred yards of the gate, defendant, who was plowing near his house, looked up and saw them, stopped his horse and plow where they were, and walked rapidly to his house, reaching there before the Dutys and deceased. When deceased got into the lot, defendant was standing by the well. Deceased and William Duty, Jr., started on up the road, through the lot, to the other gate. As deceased got opposite the well, defendant said to deceased, "What did you mean by talking to me as you did the other night." Deceased replied: "I will see you some other time about that," and started to walk on. Defendant said "You won't see any better time than right now," and raised his gun and fired, shooting deceased in the back, on the left side near the shoulder-blade bone. Deceased (Jerry Russell) died instantly. Upon an examination it was discovered that deceased had a derringer in the bottom of his pocket. There was no demonstration made by deceased of any kind, showing hostile intentions on his part. In his right hand he held his hat, when shot, and was still holding it after death. These are in substance the simple facts attending the homicide, as sworn to by William Duty and his sister.

Now, if these facts are true,— and the jury, by their verdict, say they are,— defendant is guilty of murder upon express malice. For they show a calm and sedate mind, a formed design to kill,— a design formed while the mind was sedate, cool and without excitement,— such excitement as would reduce the homicide to murder of the second degree.

We have given to this record that examination commensurate with the terrible consequences to the defendant, and are constrained to hold that there is no such error apparent as will authorize a reversal of the judgment. It must, therefore, be affirmed.

*Affirmed.*

[Opinion delivered June 24, 1885.]